UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 607 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Paul Murphy filed a claim for disability insurance benefits ("DIB") with the Social

Security Administration, alleging that he had become disabled due to a heart attack. The

Commissioner denied the claim and then denied Murphy's request for reconsideration. Murphy

sought and received a hearing before an administrative law judge ("ALJ") pursuant to 20 C.F.R.

§ 404.914. The ALJ denied the claim, and the Social Security Appeals Council denied Murphy's

request for review of the ALJ's decision, making the ALJ's decision the final decision of the

Commissioner. *See Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). Murphy timely

filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's

final decision. Doc. 1. Before the court are the parties' cross-motions for summary judgment.

Docs. 12, 21-1. For the following reasons, Murphy's motion is granted and the Commissioner's

motion is denied, and the case is remanded to the Commissioner for further proceedings.

**Background**

The following facts are taken from the administrative record.

## A.     Factual Background

Murphy was born on February 26, 1957, has a high school education, and speaks English. He worked as a cement truck driver for twenty-seven years before suffering a heart attack on December 19, 2005.  Murphy subsequently found part-time work as the front-desk attendant at a bowling alley.  He contends that he is disabled and unable to sustain full-time employment because he suffers from several medical conditions—including sleep apnea, exhaustion, fatigue, dizzy spells, lightheadedness, sweating, shortness of breath, trouble concentrating, knee pain, diarrhea, and headaches—related to his heart condition and exacerbated by his extreme obesity.

Shortly after his heart attack, which required emergency cardiac catheterization and angioplasty surgery to clear a completely blocked coronary artery, Murphy began treatment with Dr. Rafael Vargas, a primary care physician, and Dr. Manoj Duggal, a cardiologist.  In a June 2006 "Cardiac Report" to the Illinois Bureau of Disability Determination Services, Dr. Vargas, who has seen Murphy three times, recorded Murphy's New York Heart Association ("NYHA") rating as Class III.  Doc. 11-10 at 19.  NYHA classifications estimate a patient's functional capacity, which is the physical activity a person's heart can tolerate.  Class III indicates that the patient has "cardiac disease resulting in marked limitation of physical activity.  They are comfortable at rest.  Less than ordinary activity causes fatigue, palpitation, dyspnea [shortness of breath], or anginal pain [chest pain]."  American Heart Association, "Classes of Heart Failure," www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp.  Dr. Vargas also concluded that Murphy was suffering from persistent fatigue and shortness of breath, but that there were no restrictions on his ability to

perform daily living activities such as household duties, grocery shopping, and climbing stairs. Doc. 1-10 at 20.

Dr. Duggal saw Murphy every three to six months beginning in March 2006 and personally implanted a defibrillator in Murphy's chest to reduce the likelihood of sudden cardiac death. Dr. Duggal twice completed "Cardiac Functional Capacity Questionnaires" regarding Murphy. The first, executed in August 2007, recording Murphy's NYHA functional capacity as Class III. The report stated that Murphy suffered from shortness of breath and sweatiness and that, as a result, he could walk only two to three blocks without rest or suffering severe pain, could stand for about two hours and sit for about four hours in an eight-hour workday, and, if working, needed to take more than four days off per month due to his health. Dr. Duggal concluded that if Murphy returned to work, he would need a job that permitted him to "shift[] positions at will from sitting, standing or walking," to take at least two unscheduled breaks during the day, and to avoid lifting more than twenty pounds. Doc. 11-11 at 34-38.

The second Functional Capacity Questionnaire, which Dr. Duggal completed in August 2008, diagnosed Murphy with an NYHA functional capacity of Class II, which "result[s] in slight limitation of physical activity. [Patients] are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." American Heart Association, "Classes of Heart Failure," *supra*. Dr. Duggal noted that Murphy suffered from shortness of breath, fatigue, and dizziness, and that those symptoms occasionally interfered with the "attention and concentration needed to perform even simple work tasks." Doc. 11-11 at 56. Dr. Duggal also reported that Murphy could walk two blocks without rest or severe pain, could stand for less than two hours and sit for about four hours in an eight-hour workday, and needed two or

three unscheduled breaks during a workday in order to lie down. Dr. Duggal further indicated that Murphy would need to shift at will among sitting, standing, and walking while at work; to elevate his legs to a ninety-degree angle during prolonged sitting; and to take more than four days off per month due to his health. *Id*. at 57-58. In both assessments, Dr. Duggal stated that Murphy's impairments have lasted and could be expected to last at least twelve months. *Id*. at 36, 57.

Both before and between Dr. Duggal's NYHA functional capacity evaluations, Murphy underwent several clinical tests. Heart stress tests revealed that Murphy's ejection fraction, a measure of the heart's ability to pump blood, ranged from thirty-five percent after his surgery to nearly fifty percent in April 2008. Doc. 11-9 at 60; Doc. 11-10 at 46; Doc. 11-11 at 46. An ejection fraction greater than fifty percent is generally deemed normal. Doc. 11-9 at 50. A sleep study revealed that Murphy had "positional obstructive sleep apnea," which required him to use a device that stopped him from sleeping on his back and prevented an obstruction to his oxygen intake. Doc. 11-10 at 24.

During treatment sessions, Murphy repeatedly told Dr. Duggal that he was suffering from shortness of breath and fatigue. Doc. 11-11 at 66. In a series of letters from Dr. Duggal to Dr. Vargas, however, Dr. Duggal noted that Murphy "feels well and reports no symptoms," *id*. at 99, "feels better [with n]o chest pain or chest pressure," *id*. at 98, and "report[ed] no chest pain or pressure," *id*. at 64-65.

At the request of the state agency, Dr. Young-Ja Kim completed a "Physical Residual Functional Capacity Assessment" of Murphy. Dr. Kim based his assessment on a review of Murphy's file as it existed in July 2006, and he never personally examined or treated Murphy.

Dr. Kim concluded that Murphy could stand for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, frequently lift ten pounds, occasionally lift twenty pounds, and engage in unlimited pushing and pulling activities. Dr. Kim left blank a section asking him to "[e]xplain how and why the evidence supports [his] conclusions" regarding lifting, standing, and sitting. Doc. 11-10 at 33. Dr. Kim opined that Murphy could occasionally climb stairs, stoop, kneel, crouch, or crawl at work, and that he had no limitations in reaching overhead or in working in extreme environmental conditions. *Id*. at 34-36. A second state agency doctor, Dr. Henry Belnet, reviewed Dr. Kim's findings on October 5, 2006. Dr. Belnet stated without further explanation, "I have reviewed all of the evidence in file and the assessment of 7/13/06 is affirmed as written." *Id*. at 41.

**B.     The Administrative Hearing**

At the administrative hearing before the ALJ, Murphy testified that in the months following his heart attack he noticed an improvement in his health, but that he had more recently "kept on getting tired and exhausted" and had so informed Dr. Duggal at each visit. Doc. 11-4 at 57. Murphy further testified that after he started working part-time in July 2007, a decision motivated by financial considerations, *ibid*., he was consistently "wiped out and exhausted" and needed to rest for an hour to ninety minutes after returning home, *id*. at 55, 67. Murphy noted that he was able to sit at work when necessary. *Id*. at 51-52.

Murphy testified that while he does not have chest pain, shortness of breath while sitting, or emotional problems, *id*. at 65, he does get "knock[ed] out" climbing stairs, lightheaded and sweaty when standing for forty-five minutes, fatigued when walking a block and a half, sore legs when sitting for more than three hours, and dizzy when standing, *id*. at 67, 71-73. Murphy added

that he has diarrhea, indigestion, gas, and headaches as side effects of his medications. *Id*. at 74.

When asked by the ALJ how Dr. Duggal reached his diagnoses, Murphy said he did not know.

*Id*. at 63. Murphy testified that Dr. Duggal was aware of his part-time employment, *id*. at 62,

was aware of his dizzy spells and difficulties standing, *id*. at 75, and had told Murphy to elevate

his legs while sitting, *id*. at 72. Regarding his daily activities, Murphy testified that he drove five

or six times a week, primarily to and from work, and that he attempted to help around the house

with cooking and laundry. *Id*. at 50, 67.

The vocational expert ("VE"), Michelle Peters, testified about Murphy's previous work

and his prospects for other employment in the Chicago metropolitan area. VE testimony helps to

determine "whether [the claimant's] work skills can be used in other work and the specific

occupations in which they can be used …." 20 C.F.R. § 404.1566(e). At a hearing, a VE may

"respon[d] to a hypothetical question about whether a person with the physical and mental

limitations imposed by the claimant's medical impairment(s) can meet the demands of the

claimant's previous work, either as the claimant actually performed it or as generally performed

in the national economy." 20 C.F.R. § 404.1560(b)(2).

The VE opined that Murphy's previous work as a cement truck driver was semi-skilled

labor with a medium level of exertion and that his part-time work as a bowling alley cashier was

unskilled labor requiring light exertion. The VE then was asked a series of hypothetical

questions regarding employment prospects for hypothetical individuals. The ALJ asked what

sort of and how many jobs an individual of Murphy's age, education, and work experience might

find if he was limited to full time work at the "light exertional level" and could only occasionally

climb stairs, crawl, or kneel, and could never climb ladders, never engage in repetitive pushing

or pulling, never engage in repetitive reaching overhead with his left arm, and never be exposed to extreme environments. The VE estimated that there would be 5,000 cashier jobs, 2,500 assembly positions, and 1,200 inspection jobs in the metropolitan area. The ALJ then adjusted the hypothetical to suppose that the employee would have the option to sit or stand at will. With the new limitation, the VE excluded the cashier jobs from the pool, and reduced the assembly and inspection jobs to 1,250 and 600, respectively. Doc. 11-4 at 81-83. The VE also estimated that there are 1,200 assembly positions, 950 hand packaging positions, and 1,000 telemarketer positions that are entirely sedentary. *Id*. at 83.

Murphy's counsel asked the VE if any jobs would allow an employee to take two unscheduled fifteen-minute breaks a day. The VE responded that no such jobs existed because an extra thirty minutes of break time "would be excessive." *Id*. at 86. When asked about the impact of four or more health-related absences in a month, the VE responded that "[i]t would eliminate all substantial gainful activity." *Id*. at 87.

## C.     The Commissioner's Decision

The ALJ issued a decision finding that Murphy was not disabled and therefore that he was ineligible for DIB. The ALJ followed the "five-step sequential evaluation process" for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The five steps are as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments [in 20 C.F.R. Part 404, Subpart P, App. 1] that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.

The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (internal quotation marks omitted); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). RFC "is defined as 'the most [the claimant] can still do despite [his] limitations.'" *Weatherbee*, 649 F.3d at 569 n.2 (alterations in original) (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)). "A finding of disability requires an affirmative answer at either step three or step five. The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At the fifth step, the government "must present evidence establishing that the claimant possesses the [RFC] to perform work that exists in a significant quantity in the national economy." *Weatherbee*, 649 F.3d at 569 (footnote omitted).

Here, the ALJ determined that Murphy previously engaged in "substantial gainful activity" but had not done so since the alleged onset date (step one); that Murphy suffered from the severe impairments of obesity and coronary artery disease (step two); and that neither impairment was listed or equal to a listing in 20 C.F.R. Part 404, Subpart P, App. 1 (step three). Murphy does not challenge the ALJ's rulings at any of these steps. As part of step four, the ALJ determined that Murphy had the RFC to "perform most light work." Doc. 11-4 at 18. To support this determination, the ALJ reasoned:

After careful consideration of the entire record, I find that the claimant has the RFC to perform most light work as defined in 20 CFR 404.1567(b). He can lift, carry, push and/or pull up to 20 pounds occasionally and up to 10

pounds frequently, and he can sit, stand and/or walk throughout a normal workday, with typical breaks. Because of his obesity and history of heart disease, he should never climb ladders, ropes or scaffolds, work on moving or unstable surfaces, crouch or crawl, he should only occasionally climb ramps or stairs, stoop or kneel. He should not do constant repetitive lifting or reaching overhead with the non-dominate left extremity, as he complains of discomfort when he does so related to his implanted defibrillator, and he should not perform work that would expose him to extremes of temperature, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. The record does not establish that claimant requires a sit-stand option or that he must elevate his legs to 90° while seated. I find further that claimant would be distracted only rarely by pain, fatigue or other symptoms, to the extent that he was off task and not productive, outside break time, and that he is able to sustain work in jobs within his physical RFC.

*Id*. at 18-19. Given this conclusion, the ALJ found that Murphy was unable to perform his past

work as a cement truck driver, which requires exertion at the medium level.

At step five, however, the ALJ concluded that Murphy was capable of performing other

jobs that were available in substantial numbers in the Chicago metropolitan area. In particular,

the ALJ found, based on the VE's testimony, that an individual with Murphy's RFC could work

as a full-time cashier, assembler, or inspector. Having determined that jobs existed for an

individual with Murphy's RFC, the ALJ determined that Murphy was not disabled under the

Social Security Act and thus was ineligible for DIB.

### Discussion

A claimant is disabled under the Social Security Act if he is unable to perform "any

substantial gainful activity by reason of a medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant will

prevail if his impairments prevent him from performing his prior employment and any other job

generally available in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A).  As noted above, because the Social Security Appeals Council declined to review the ALJ's decision that Murphy was not disabled, the ALJ's decision became the Commissioner's final decision.

Section 405 of the Act authorizes judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g).  The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted).  If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe*, 425 F.3d at 355.  Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or a decision containing errors of law, *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *accord Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence,

the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the Commissioner must "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence and to enable [the court] to trace the path of his reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation marks omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Murphy argues that the Commissioner's decision erred in four respects: (1) by improperly affording more weight to the medical opinions of the two state agency doctors than to the opinions of Murphy's treating physicians; (2) by failing to consider Murphy's obesity in combination with his other impairments; (3) by improperly assessing Murphy's credibility; and (4) by failing to consider all relevant evidence when rendering its RFC determination. Because the court agrees with the first two contentions, remand is necessary.

### A.    The Weight Afforded Medical Opinions

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Roddy v. Astrue*, 705

F.3d 631, 636 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson*, 615 F.3d at 749 (internal quotation marks omitted). Put another way, "[e]ven though the ALJ was not required to give [the treating physician's] opinion controlling weight, [the ALJ] was required to provide a sound explanation for his decision to reject it and instead adopt [the state agency physician's] view." *Roddy*, 705 F.3d at 636 (citations omitted).

In reaching its RFC conclusion, the ALJ did not give controlling weight to Dr. Vargas's opinion; the explanation given was that Dr. Vargas "had little documented contact with claimant before he completed the impairment form and his assessment of claimant's cardiac impairment is less reliable than that of claimant's treating cardiologist." Doc. 11-4 at 23. As to Dr. Duggal, the ALJ's opinion determined that his contemporaneous progress notes and diagnostic studies did not "well support" his RFC opinions. *Ibid*. In particular, the ALJ stated that Dr. Duggal's 2008 diagnosis placed Murphy in NYHA Class II and that the classification was "apparently consistent with claimant's normal or near-normal ejection fraction reported on numerous imaging studies." *Ibid*. The ALJ also found it problematic that Murphy did not know how Dr. Duggal reached his medical diagnosis. The ALJ explained that because the ALJ could not identity in Dr. Duggal's notes the basis for his sit-stand and leg-elevation opinions, his communication of those opinions to Murphy, or his awareness of Murphy's part-time employment, controlling weight could not be given to Dr. Duggal's opinions. The ALJ added: "The State agency doctors, while not cardiologists, are more familiar with the process of translating limitations caused by impairments into the type of functional RFC opinions

contemplated by the regulations, and those opinions therefore are accorded weight to the extent they are consistent with the RFC conclusion above." *Ibid*.

Murphy does not challenge the ALJ's findings regarding Dr. Vargas, and instead focuses on Dr. Duggal. None of the ALJ's explanations as to Dr. Duggal qualify as "good reasons" for rejecting his opinion.

As an initial matter, if an ALJ is concerned that a treating physician "lack[s] backup support" for his assessment, the ALJ "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)); *see also* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) ("[I]n some instances, additional development required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information"). At the hearing, the ALJ noted that "I'm just not confident that we have all the records" from Dr. Duggal and that it was possible that certain information was not written in Dr. Duggal's notes. Doc. 11-4 at 65 ("He doesn't write it down. It might be on your paper chart. Sometimes they have separate [documents]."). Although the ALJ held the administrative record open for thirty days after the hearing, the ALJ did so not to seek information regarding the basis for Dr. Duggal's

opinions, but only to determine if Murphy's testimony could be corroborated by an April 2008 progress note from Dr. Duggal and to receive "cardiac rehab records" that did not involve Dr. Duggal. *Id.* at 91-93 ("Especially since … [Murphy's] testimony about the side effects [from the medication], that those had been reported to the doctor.  I mean … I'm not seeing that anywhere else.  So if that's a recent thing I do need to … get some corroboration for that.").

The ALJ indicated that "I cannot find in Dr. Duggal's notes" the basis for his opinions, that "I also do not see" whether Dr. Duggal was aware of certain information, and that "apparently" certain evidence underpinned a particular conclusion. *Id.* at 23.  This aspect of the ALJ's decision indicates that the ALJ concluded that the basis for Dr. Duggal's medical opinions was not readily discernable.  *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (holding that ALJ's statement that "it is unclear" what information underpinned the doctor's opinion is "tantamount to 'not readily discernable'").  The ALJ therefore "should have contacted Dr. [Duggal] for clarification of [his] medical opinions, asking for more detail regarding" his knowledge of Murphy's employment, the basis for his sit-stand and elevation opinions, and whether he communicated those opinions to Murphy.  *Barnett*, 381 F.3d at 669; *see also Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010) ("an ALJ may not draw conclusions based on an undeveloped record and has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable") (internal quotation marks omitted); *Simila*, 573 F.3d at 517 (stating that the ALJ should have re-contacted the treating physician where the ALJ indicated that the basis for the physician's medical opinions was "not readily discernable").

The ALJ's decision also states that Dr. Duggal's NYHA Class II classification was "apparently consistent with claimant's normal or near-normal ejection fraction." Doc. 11-4 at 23. This statement does not give the reviewing court any indication as to why this fact is relevant or why it undermines the reliability of Dr. Duggal's opinions. Did the ALJ think that Class II functional capacity could not support a claim for disability? Or did the ALJ believe that all individuals with normal ejection fractions are free from fatigue, palpitation, dyspnea, or anginal pain as a result of ordinary physical activity? It is impossible to tell from the ALJ's explanation, which prevents meaningful judicial review. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (holding that the ALJ's noncommittal explanation that the claimant's medical history was "not necessarily consistent with his allegations of disability" did not give the court any way to review the opinion). The ALJ also placed weight on the fact that Murphy "had 'no idea' how Dr. Duvall [sic] knew for how long claimant could sit, stand or walk." Doc. 11-4 at 23. As discussed above, the ALJ had the duty "flesh out" the basis for Dr. Duggal's opinion to the extent it was not readily discernable. *Barnett*, 381 F.3d at 669.

Even if "an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). "The applicable regulations guide that decision by identifying several factors that an ALJ must consider: 'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Ibid*. (quoting *Larson*, 615 F.3d at 751); *see also Roddy*, 705 F.3d at 637 (noting that Social Security regulations provide that "more weight should be given to the opinions of doctors who have (1) examined a

-15-

claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, [and] (5) offered opinions that are consistent with the objective medical evidence and the record as a whole") (citing 20 C.F.R. § 404.1527(c)(2)(i), (ii)).  The Seventh Circuit repeatedly has criticized ALJ decisions that discount the treating physician's opinion but say nothing regarding this set of factors.  *See*, *e.g.*, *Mueller v. Astrue*, 493 F. App'x 772, 776-77 (7th Cir. 2012) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.") (internal quotation marks omitted); *Campbell*, 627 F.3d at 308; *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (holding that if the treating physician's opinion is not given controlling weight, "the checklist comes into play").

Several of the factors support the conclusion that Dr. Duggal's opinions, even if not controlling, should be given substantial weight.  Dr. Duggal had a relationship with Murphy spanning more than twenty-four months; he treated Murphy every three to six months, Doc. 11-4 at 21-22; he is a cardiologist; and his opinions remained relatively consistent throughout the course of his treatment.  Doc. 11-11 at 66 (progress notes documenting shortness of breath and fatigue); *id*. at 34-38, 57-58 (functional capacity assessments nearly identical).  "Proper consideration of these factors may have caused the ALJ to accord greater weight to Dr. [Duggal's] opinion[s]" even if the ALJ had trouble finding certain evidence in Dr. Duggal's notes.  *Campbell*, 627 F.3d at 308 (where the treatment lasted fifteen months, the treating

physician's findings remained relatively consistent, and the treating physician practiced in the relevant medical specialty, the physician's opinion "should be given great weight"). Because the ALJ did not explicitly address the above-referenced factors or indicate what weight the treating physician's opinions were given, remand is warranted. *See Santoro v. Astrue*, 2011 WL 528257, at *9 (N.D. Ill. Feb. 7, 2011) ("To the extent the ALJ's decision does not explicitly address the checklist of factors as applied to the medical opinion evidence, it must be reversed for further analysis.") (internal quotation marks omitted); *Smith v. Comm'r of Soc. Sec.*, 2010 WL 1838366, at *10 (N.D. Ind. May 6, 2010) (same).

The ALJ's reliance on the opinions of non-examining state agency doctors who reviewed only part of Murphy's records further undermines confidence in the ALJ's decision. Dr. Kim and Dr. Belnet, neither a cardiologist, reviewed Murphy's health records as they existed in July 2006. As a result, they did not have the benefit of over two years of subsequent treatment records. The Seventh Circuit has cautioned that where state agency doctors do not have the opportunity to review subsequent treatment records, their opinions may be entitled to less weight because the new information "would affect the state agency reviewers' assessment of" the claimant's health. *Campbell*, 627 F.3d at 309; *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[T]he ALJ would be hard-pressed to justify casting aside Dr. Radzeviciene's opinion in favor of these earlier state-agency opinions. By 2008, the state-agency opinions were two years old. Dr. Radzeviciene's opinion, on the other hand, was the most recent professional word on Jelinek's mental impairments, by a treating psychiatrist who had seen her repeatedly over a two-year period with full access to her complete medical record to that point.").

The ALJ's explanation for why greater weight was given to the state agency doctors' opinions is unpersuasive. The ALJ stated that Dr. Kim and Dr. Belnet "are more familiar with the process of translating limitations caused by impairments into the type of functional RFC opinions contemplated by the regulations, and those opinions therefore are accorded weight to the extent they are consistent with the RFC conclusion above." Doc. 11-4 at 23. This explanation puts the cart before the horse, giving weight to the particular medical opinions that mesh with the ALJ's RFC conclusion and discounting those that do not. Given this explanation, it would appear that the ALJ did not assess the medical opinions before reaching an RFC conclusion. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (where the ALJ rejected the claimant's testimony "to the extent" it was inconsistent with the RFC assessment, the court observed that the ALJ's "post-hoc statement turn[ed] the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not").

Even assuming the ALJ weighed the consultative opinions before reaching an RFC determination, the ALJ's reasoning does not withstand scrutiny. The ALJ discounted Dr. Vargas's health assessments because he was not a cardiologist and because he treated Murphy only three times before offering his opinion on June 22, 2006. This, the ALJ concluded, rendered Dr. Vargas's opinion unreliable. Less than a month later, Dr. Kim (one of the state agency doctors) offered his assessment of Murphy's health. Like Dr. Vargas, Dr. Kim is not a cardiologist, but unlike Dr. Vargas, Dr. Kim had never met or personally treated Murphy. The same is true of Dr. Belnet, who rendered his one-sentence opinion in October 2006. Both opinions were accorded weight even though they were not accompanied by any supporting

explanations.  *See* 20 C.F.R. § 404.1527(d)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions."); *Santoro*, 2011 WL 528257, at *9 (holding that reliance on the opinions of several state agency doctors who never treated the claimant or only briefly treated him was inappropriate absent an explanation of why the state doctors' medical conclusions were "more reliable than the opinions proffered by" the treating physician).

The ALJ justified this approach on the ground that the state agency doctors are more familiar with the process of converting physical limitations into RFC opinions.  This, however, says nothing about the substance of Dr. Kim's and Dr. Belnet's opinions regarding whether Murphy had physical limitations, and it does not explain why their conclusions are entitled to weight.  Whether Dr. Kim and Dr. Belnet can translate a claimant's limitations into a coherent and technically proficient RFC opinion means nothing if they do not provide reliable support at the anterior step of assessing and determining the claimant's limitations.  Because the ALJ did not adequately address why the state agency doctors' opinions were entitled to greater weight on this score, reliance upon their opinions was inappropriate.  *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (an ALJ cannot "accept one physician's opinions but not the other's … without any consideration of the factors outlined in the regulations, such as the differing specialties of the two doctors [and] the additional diagnostic testing conducted by [the treating doctor]"); *see also Collins v. Astrue*, 324 F. App'x 516, 521 (7th Cir. 2009) (citing *Moss* for the proposition that an "ALJ's decision to accept one physician's opinion over another's without any consideration of the factors outlined in the regulations is reason for reversal").

In an effort to buttress the ALJ's determination, the Commissioner's brief argues that the ALJ rightly gave less weight to Dr. Duggal's opinion because (1) Dr. Duggal's 2007 and 2008 assessments noted increasingly serious physical limitations without showing corresponding deteriorations in Murphy's health, in contravention of *Griffith v. Callahan*, 138 F.3d 1150, 1155 (7th Cir. 1998); (2) ejection fractions measure the ability of the heart to pump blood, and the more blood a heart can pump, the "slight[er]" the physical limitations; and (3) Murphy may have had NYHA Class II symptoms like shortness of breath and fatigue, but those symptoms were not severe because Dr. Duggal had cleared Murphy for light work in March 2006 without a sit-stand option or the need to elevate his legs. The Commissioner's brief adds that the ALJ gave the state agency doctors' opinions more weight for "multiple reasons," including the reasons discussed above and that Dr. Duggal's opinion was inconsistent with a Class II finding.

These arguments may be good ones, but they were not offered in the ALJ's decision. The court's review is limited to the reasons articulated in the ALJ's decision, not the post-hoc rationale submitted in the Commissioner's brief. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Roddy*, 705 F.3d at 637; *Martinez*, 630 F.3d at 694; *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) ("These post-hoc rationalizations not only undermine our confidence in the accuracy of the Commissioner's representations of the record, but we have repeatedly warned that attempts to supplement the ALJ's decision are inappropriate. … [T]he government may not provide the missing justification for an ALJ's decision."); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (holding that "a persuasive brief [cannot] substitute for" the ALJ's deficient opinion); *Larson*, 615 F.3d at 749. Accordingly, the ALJ's decision cannot be sustained based on the new rationales pressed by the Commissioner's brief.

For these reasons, the ALJ's RFC determination cannot be sustained. Remand is warranted on this ground alone. *See Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012); *Scott*, 647 F.3d at 740; *Martinez*, 630 F.3d at 697-99.

**B.     Considering the Combined Effect of Murphy's Obesity and His Other Impairments**

The ALJ's RFC determination is also deficient in failing to sufficiently consider Murphy's extreme obesity. Murphy is 5 feet 6 inches tall and weighs between 250 and 255 pounds, which translates to a body mass index ("BMI") between 40.4 and 41.2. A person with a BMI of 30 is deemed obese, and a person with a BMI of 40 is deemed extremely obese. SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002). The Seventh Circuit has explained that "the failure to consider the bearing of [the claimant's] extreme obesity" is a "grave[] error." *Martinez*, 630 F.3d at 698. Indeed, even if the ALJ mentions obesity as a severe impairment, as the ALJ did here, if the ALJ's decision "did not consider its significance in relation to" other medical ailments, remand is warranted. *Ibid.*; *see also Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (faulting the ALJ for "fail[ing] to take into account [the claimant's] obesity").

Apart from noting that Murphy's obesity is a severe impairment, the ALJ's decision mentioned Murphy's obesity only one other time, stating that "[b]ecause of [Murphy's] obesity and history of heart disease, he should never climb ladders, ropes or scaffolds, work on moving or unstable surfaces, crouch or crawl, and he should only occasionally climb ramps or stairs, stoop or kneel." Doc. 11-4 at 18. The Commissioner's brief argues that because the ALJ "considered all symptoms," the ALJ adequately assessed the impact Murphy's extreme obesity had on his other ailments and employment options. Doc. 21-2 at 10. Yet the ALJ's opinion does not address how Murphy's extreme obesity bears on his ability to sit or stand for at least six

hours, or how his extreme obesity interacts with his Class II designation, the ejection fractions, and the fatigue and shortness of breath that already arise from ordinary physical activity. This "failure to consider the cumulative effect of impairments not totally disabling in themselves was an elementary error" that warrants a remand. *Parker*, 597 F.3d at 923; *see also Arnett*, 676 F.3d at 591-92; *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

On remand, the ALJ should engage in a cumulative assessment of Murphy's cardiac impairments and obesity that the court can follow and assess. *See* 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); *Martinez*, 630 F.3d at 698 ("It is one thing to have [trouble standing and sitting because of a bad heart], it is another thing to have a bad [heart] supporting a body mass index in excess of 40."); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Golembiewski has a host of significant medical conditions, including the partially amputated leg, epilepsy, back pain, bowel and bladder dysfunction, and grasping problems that we have discussed. Having found that one or more of Golembiewski's impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of this entire constellation of ailments—including those impairments that in isolation are not severe. On remand the agency must remember that a competent evaluation of Golembiewski's application

depends on the total effect of all his medical problems.") (citations omitted); *Green*, 204 F.3d at

782 (remanding because "[e]ven if the shortness of breath and the chest pain were not in

themselves enough to disable Green from doing medium work, the combination of these

conditions together with his arthritis and swollen leg may have been").

### C.       Murphy's Two Other Arguments

Given the foregoing analysis, it is unnecessary to consider Murphy's arguments

regarding the ALJ's credibility determinations and the ALJ's alleged failure to analyze all

relevant evidence.  *See Fox v. Astrue*, 2010 WL 1381662, at *6 (S.D. Ind. Mar. 30, 2010)

("[B]ecause on remand the ALJ will reconsider the mental health evidence and restrictions …

that process is likely to also [a]ffect the ALJ's view of [the claimant's] overall credibility.  Under

these circumstances, the court cannot affirm the ALJ's credibility analysis."); *Hudson v. Astrue*,

2009 WL 2612528, at *14 n.6 (N.D. Ill. Aug. 24, 2009) ("In light of this remand order [to

reassess an RFC determination], we find it unnecessary to address the other arguments that

plaintiff has raised.  On remand, the ALJ will be free to re-examine and reassess those points,

including … his credibility decisions in determining plaintiff's RFC.").

### Conclusion

For the foregoing reasons, the court grants Murphy's motion for summary judgment,

denies the Commissioner's motion for summary judgment, and remands the case to the

Commissioner for further review consistent with this opinion.

June 11, 2013                                    _____
                                                       United States District Judge